And at this time, we'll hear Reich v. Bettencourt Lopez. Good morning. May it please the court. I am Jeff Grell. I'm here on behalf of Ambassador Otto Reich and Otto Reich Associates, the appellants in this appeal. I'm going to jump right to the critical issue here, which we think is relatedness. As you know, the district court dismissed Ambassador Reich's RICO claim on the basis that there was no pattern. And to prove pattern, you have to prove relatedness and continuity. And the district court decided that the alleged bribes scheme the defendants engaged in down in Venezuela was unrelated to the acts of mail and wire fraud that were designed to discredit Ambassador Reich from testifying as an expert witness in a defamation trial that's primary focus was on the truth of those bribery allegations. And that was a defamation case the defendants brought against. Is my right that your view is if the vertical test is satisfied, the horizontal test is always satisfied for relatedness? Generally speaking, under this court's prior precedent, vertical relatedness does satisfy horizontal relatedness. I think that there are I can't say that it's always satisfied. I think that there would be times where that that does not perhaps occur. But in this case, we obviously have the the the acts of bribery down in Venezuela were related to Derwick Associates because obviously those acts of bribery related in energy sector contracts being awarded to Derwick. And so those predicate acts are related to the enterprise. Am I right that there were more than two years before the calls? Excuse me? More than two years before the telephone calls that the bribery allegations are in 2010 and the calls are 2012? The bribery allegations lasted from October of 2009 until November of 2010. And I believe that the phone calls occurred in the fall of 2012. Is that relevant under your test and that there was a two year time difference? No, I don't believe so. Because, number one, under the statutory definition of pattern, 1961 subdivision five, any two acts within 10 years of each other can be combined to look to look to the pattern. And again, H.J. Inc. redefines the whole definition of pattern. But still, generally speaking, if you've got acts of racketeering occurring within 10 years of each other, they can be viewed in a block to establish pattern and continuity. I don't think anything has changed about that. H.J. Inc. doesn't change that about the statutory definition. So two years is well within that 10 year time difference. Plus the temporal relationship here between the defamation suit being filed by defendants against BBC down in Florida in late 2012. And, again, the whole issue in that case was the bribe scheme. Did it actually occur or not? And BBC then, literally a month later, contacts Ambassador Reich to retain him as an expert. And then the next month, in November, December, defendants start making phone calls to BBC and to other clients of Ambassador Reich saying, oh, you think he's an independent expert? He's no independent expert. He's our guy. He's our inside guy. And thus discrediting him to testify as an expert in the very case . . . In order to demonstrate relatedness, there are many different ways to do it. Yes. What are you relying on? The same or similar purposes, results, participants, victims, methods of commission, or some other interrelatedness by distinguishing characteristics that are not isolated events? My first . . . What are you hanging your hat on? All of them. And my first, I think the best argument, is this common sense relationship that we've been talking about here, where Ambassador Reich was hired as an expert to testify about the truthfulness of these bribery allegations. So, if you want to buy defendant's argument, defendants just woke up someday, regardless of the BBC litigation, and decided that they were going to call Ambassador Reich's clients and discredit him. That makes no sense. They called Ambassador Reich's clients to discredit him from testifying about the bribery allegations. That is a common sense relationship, which doesn't fall in the HJA . . . You just called that a common sense relationship, but that's not my question. My question is, are you relying on similar purposes, results, participants, victims, methods of commission, or some other interrelatedness based on distinguishing characteristics that are not isolated events? Well, my point goes to the other distinguishing characteristics, but also when you look at common purpose . . . And what are those other distinguishing characteristics? That common sense relationship that I just described. Ambassador Reich was hired as an expert to testify about the bribery allegations, and then was discredited from testifying. Aren't those isolated events? Which? When you're talking about interrelated by distinguishing characteristics that are not isolated events. They're not. Ambassador . . . the wire fraud to Ambassador Reich's clients are not isolated. They occurred because he was hired as an expert to testify about the bribery. That's not isolated. They are interrelated and connected, and that, I think, goes to the last HJA factor. As far as purpose is concerned, you have a common purpose here, and that is to perpetuate and enhance the defendant's ability to engage in this bribery scheme down in Venezuela. Is that the proper level of generality where what you're dealing with is a company, however corrupted or corrupt it may be, rather than basically an association that exists only as a criminal conspiracy? I think it is the proper level, because when you go to H.J. Inc. and you look at why H.J. Inc. adopted these factors, it got away from the separate scheme approach, which suffered from that same problem. You can sparse down schemes to be so narrow that nothing can be . . . It all depends on subjective observation of where the scheme begins, where it ends, how narrow it is. Like today, are we here . . . do we all have a common purpose to hear an appeal here, or am I here to argue on behalf of Ambassador Reich? Are they here to argue on behalf of the defendants? Are you here to decide the case? You do not have common purposes, but we do. I think we all do. We're all here to talk about the case and to try to come to a resolution of it. That's the natural way to look at what happened here. None of this occurred in isolation. It was all . . . If you don't have the bribe scheme, you don't have the BBC litigation. If you don't have the BBC litigation, you don't have Ambassador Reich being hired as an expert. If Ambassador Reich isn't hired as an expert, he's not defamed by defendants. It's all related. And, the effort that they make to somehow distinguish that there has to be an exclusive purpose, rather than a common purpose, or an exclusive victim, rather than a common victim, is also contrary to H.J. Inc. We have a common victim here. It's the people in government of Venezuela. Just because . . . It's not the competitors who didn't get the energy contracts? Sure. There's more . . . Those were the victims of the corruption. These two defendants got the contracts because they bribed officials, and other companies didn't get these power contracts, energy contracts, because of the bribery scheme. Why aren't they the victims, rather than the people of Venezuela? It's kind of a broad group, isn't it? The competitors are a victim. Ambassador Reich is a victim. But, the people in government in Venezuela are also a victim. They were the people that were paying for these inflated contracts. I mean, clearly, the competitors didn't pay for them. Who lost money here? It was the people of Venezuela, the government of Venezuela. They were clearly the common victim. Just because there are other victims, like Ambassador Reich and the competitors, doesn't mean there isn't a common victim. H.J. Inc. requires a common victim. And, if there's a RICO claim, and I'll conclude . . . If there's a RICO claim, then you have access to RICO's expanded jurisdictional provisions. And, since there's no dispute that Mr. Betancourt Lopez lives here in New York City, he resides here, 1965A would bring him into the jurisdiction. Let me ask you this. Hypothetically, if there was no RICO jurisdiction, would there be . . . would there or could there be personal jurisdiction? If there's . . . I mean, let's say that the RICO claim fails. If it fails, it was certainly pled at the outset, plausibly pled, and, therefore, there would have been personal jurisdiction, right? And, the question is, if somebody . . . if a plaintiff loses on a RICO claim, do they still have personal jurisdiction over the defendant? On the basis of RICO in 1965? Yes. On the basis of RICO. If the RICO claim is dismissed under prevailing precedent, no, they would not be able to rely on those expanded jurisdictional provisions of RICO. But, you said there's diversity jurisdiction on the State law claims, right? Yes. And, that's subject matter jurisdiction. On the personal jurisdiction question, we still have the question of whether Mr. Betancourt Lopez was served here in New York City. The affidavit of the service processor indicates that the doorman initially indicated that Mr. Betancourt was home. Let me ask that for a moment, though. What about his domicile? Do you believe that that's the exclusive way of finding personal jurisdiction after Daimler on him, or do you believe that the doing business New York statutes would still apply to him? Well, I think, in this case, I was appellate counsel. I am appellate counsel. And so, I came in and looked at this case in retrospect. And, when I look at all of the contacts the defendants, especially Mr. Betancourt, have with New York City, it's enormous. And, the response to that on the domicile question is, but you know what? I never intended to live here. And, that's a subjective, if anybody can come up . . . You're saying he was domiciled here. I think that there is an overwhelming amount of evidence, circumstantial evidence, where you can look at it and infer, yes, he's domiciled here. If he's not, though, if he wasn't, is there another basis to keep him in under Daimler? Under Daimler? Yeah. I, first of all, don't think Daimler applies. I think, number one, he's an individual. So, the whole question of what does it mean to be doing business here is up in the air. But, yes, he does business here. He is at home here. He has millions of . . . Daimler only says it's corporations that you can't find present if they're doing business. But, for people, if they do some business in New York City, they now are subject to personal jurisdiction in the courts of New York City. Not some business. I mean, they have to be at home. The question, I think, is whether at home means domicile or does at home mean something more like residency. And, he clearly resides here. He claims that he's not domiciled here. So, the question is, does he elevate . . . In this case, the district court's decision to equate Daimler with domicile makes sense. But, if Daimler stops at something less than domicile and says you can be at home in a jurisdiction without necessarily being domiciled there as an individual, then you look at the enormous amount of money that Mr. Betancourt Lopez has invested here in New York City. You look at his homes. You look at all of the indicia of law firm relationships, banking relationships, PR relationships. The relationships with his personal life. He has many family members that reside here. And, on top of the fact that he was personally served here. All of these things indicate that with regard to Mr. Betancourt Lopez, there's a very strong case for jurisdiction even if the RICO claim falls away. And, that's where we would argue that Daimler stops short of requiring domicile. And, if you want to call it exceptional circumstances or whatever, Mr. Betancourt Lopez's context with this jurisdiction certainly reached the level of being at home. Thank you. You have reserved rebuttal, I believe. Yes. Yes, you have. Thank you. Good morning. Good morning, Your Honors. May it please the Court, my name is Frank Wall. I represent Alejandro Betancourt. With me at council table are Rosie Rubin and Patrick Garlinger of my office. And, also, Mr. DeMaria who represents Mr. Trabeau. And, we've agreed to split our time seven and three. Your Honors, we think Judge Etkin was clearly correct that on the face of this complaint, this is not a RICO case. There's no pattern. It's these separate predicate acts. If they are predicate acts, the travel act claims and the wire fraud claims are clearly not related to one another. And, Judge Etkin was correct on that. We have to recognize that the RICO statute does not cover all violations of the travel act. It doesn't cover all wire frauds. It doesn't cover all intentional torts. So, the inquiry here is whether or not these are related. And, as this Court has recognized and the Supreme Court has recognized, the real protection against excessive application of the RICO statute is the pattern requirement. I'd like to go directly to some of the discussion with Mr. Grell in that I found it rather stunning, actually, that now we are told at this point that Mr. Reich, the plaintiff, was hired as an expert witness. This 200-and-some-odd-paragraph, multi-page, 70-some-odd-page complaint never says that he was a witness of any kind. It says he was hired as a consultant. It says his profession is PR, lobbying, and political consulting. He gives no indication that he has any basis for being an expert witness. And I think that's because reputation can still be damaged. Oh, absolutely. He does. He makes a living at it. Absolutely. Why am I focused so much on that point? This Court has really never confronted a case where the supposed connection or relatedness between two predicate acts is, first of all, a substantive claim or crime, and then a so-called cover-up or discouraging-of-reporting predicate act. Why wouldn't that be one ball of wax? Well, it might be, arguably, in some cases. But the case that the plaintiffs cite, I think, is an excellent illustration of why it's not the case here. There is no allegation in this complaint that Mr. Reich ever had any information to report to anybody, that he reported any information to anybody, that he had firsthand knowledge or even expert knowledge of corruption with respect to our clients. His argument is that he wanted to be hired so that if he were hired, he might develop that information. He was a consultant. He never alleges that he knows some firsthand information about these clients, and that's exactly the distinction between this case and the Seventh Circuit's decision in DeGuelle. In DeGuelle, you have somebody who's an employee of a firm that's engaged in tax violations. He keeps complaining about it time after time about these tax violations. He's criticized. He's given bad reports on his employment. Finally, he says, I'm going to go to the authorities and report this. And he goes to the authorities and reports it, and he's fired. That's a retaliation kind of situation. This is nothing like that because Mr. Reich didn't report to anybody. He didn't threaten to report to anybody. He didn't say he had any facts to report to anybody other than the general information that was already in the public domain, in the blogs that were told about repeatedly in the complaint. All he knows is what's publicly available. And in addition, not only did he not report anything to anybody, they tell us in the complaint that there are four government agencies that are already conducting inquiries into the activities of the defendants. They never bring any charges, but there's really not even a suggestion that this is in the United States, the SEC, the IRS, Homeland Security, and the Treasury Department, according to the complaint. So this is a case that is a far cry from the kind of case that you might entertain, where you might say if there is a predicate crime, and if there is other criminal activity designed to discourage the reporting of that crime or retaliate against somebody who does report that crime under Sarbanes-Oxley, that might be a case where they are related. But this is not such a case. It does say in the complaint, paragraph 95, the bank hired ORA to investigate Durewicz's business practices in the United States. Why isn't that broad enough to include that kind of a conduct? Because he hasn't done — excuse me, it says the bank hired him, because at that point they haven't — at the time that the phone calls are made, they haven't been hired. There's no reason to believe that they have any information. I guess you could say, well, he's an investigator, so you don't use him as an investigator. You use somebody else as an investigator. But I still think that's a long way away from a situation where somebody's already done an investigation or they already have information that they could report. Excuse me, on that one. Yes. Cedeno had a longer relationship with Otto Reichen, right, consulting relationship? That's what we're told, yes. Okay. Yeah. Is it your view that the Cedeno, that the part of the alleged RICO scheme, that the Cedeno is not properly part of it? Can you comment on that? It doesn't seem to be part of it. We're not told that Mr. Cedeno had any particular information about Derwick, that he knew anything about the alleged bribery or anything like that. So, consequently, it would not seem that that seems to be extra, what I would think of as really perhaps arguably tortious behavior vis-a-vis Mr. Cedeno, but that's, excuse me, tortious behavior vis-a-vis the plaintiff in effect trying to discredit the plaintiff with Mr. Cedeno. And apparently Mr. Cedeno didn't have enough confidence in the plaintiff to keep him on after that. But I don't think that that makes it related to the bribery that was going on in, arguably going on in Venezuela because there's no suggestion that Mr. Cedeno had any involvement with that at all. I see my time is up. Thank you. Good morning, Your Honors. May it please the Court. Joe DiMaria. Your Honors, I'll be brief because not only is there nothing in the initial brief under Rule 28 to make any kind of an argument as to personal jurisdiction against Mr. Cabral, Mr. Cabral doesn't even raise Mr. Cabral today because there is nothing. I think the closest case this is, in the Lederman case, where they submitted some references to a joint letter to the Court with 12 points, and the Court said, well, that's not good enough. That's not an argument. You haven't … Did he, say, incorporate the district court filings? He incorporated his filings. What he incorporated was a special joint appendix to 162 to 177, which was his statement of facts allegedly supporting a prima facie case. In footnote 4 of the Court's jurisdiction order, it dealt with these two prima facie statements, one from Mr. Bettencourt, one from Mr. Cabral, and as I think the Court accurately noted, it was a statement that was chucked full of a whole bunch of things, very little, but it was facts. A lot of it was argument, legal conclusions, reference. One reference was my client had a MasterCard at Citibank, and that subjects him to jurisdiction. And the Court, I think, gave that short shrift as it should have, but I think going back to what he's supposed to do on an appeal, that's all he did. So in his one-page argument, his initial brief, and he did nothing in his reply brief, nor should he have been able to. He says, well, go look at what I submitted in my statement of facts in opposition. It's more than just a MasterCard. I've got the filing. It talks about his time in New York, his dealings with the banks, his assets in New York, hiring law firms, business accounts. I agree. The 1286 filing before the District Court, right? Right. And the District Court dealt with that. First of all, the District Court dealt with some of those in its initial order in August 2014 on the special jurisdiction, and then the District Court dealt with that in the April 30th order and went through it in the general statement why a law firm is not enough, why the PR was not enough, why the so-called focus of the money in the bank is really more on Mr. Bettencourt. There was some focus, but there's these very broad statements, and then as the District Court correctly noted, one of the big differences is that Mr. Travau doesn't have any residence there, doesn't own any property there, and I think the comment was made, sleeping on the friend's couch really doesn't subject you to personal jurisdiction. But the point is, I've been put in a position on this appeal where he makes no argument. I mean, what part of Judge Etkin's order does he disagree with? What part of his order is he saying was wrong? Nothing. He just kind of throws it on the table and says, well, go look at my 118 paragraphs that I submitted, and if there's something in there, go find it. I don't think Rule 28 allows that. I don't think it's fair to my client. There was nothing to defend. So my position is, I think Judge Etkin's order stands unchallenged before this Court, and I would ask it to be summarily affirmed. Thank you. Thank you. William Republic. Yes. Mr. Wohl spoke about how the pattern element is the bulk work against frivolous RICO claims. Relatedness is one of the most liberal standards in all of RICO's elements. It is not a burdensome standard. It is not a high hurdle. This Court has held that before, and Feinstein in other cases cited in our briefs. So relatedness simply means, yeah, if they stole a loaf of bread from somebody back in 1995 and it wasn't Otto Reich, well, Otto Reich can't use that loaf of bread as part of the pattern that he wants to sue them on today. But there's a relationship, as we said here before. Without the bribery scheme, there's no BBC litigation. Without the BBC litigation, there's no hiring of Otto Reich. What's required to establish relatedness on the basis of cover-up? Of cover-up? Well, again, I think you look at what Mr. Wohl argued here, and he said, well, Otto Reich had nothing to conceal. He was just a consultant. He was just looking at publicly available information. That argument can only be made from hindsight. Obviously, when the call was made to BBC to tell them that he worked for Derwick, defendants didn't know what Otto Reich knew. Otto Reich is a big crusader against corruption down in Latin America. They had no idea what he knew. All that they knew is they didn't want him involved in this. They could assume, based on what you just said, that he knew a lot. Right, right. And they want to quiet the guy, and that's what they did. Of course, they obviously didn't think about this very well because it got them into litigation one way or the other, and they fired off a few phone calls thinking that they could muscle people out of the equation like they do, including to reporters and everybody else up and down the line. And, again, when you look at what they did to Otto Reich, it's not like he's the only person they did this to. Anybody who's critical of their business practices in Venezuela, as is alleged in the complaint, is attacked by them. Otto Reich is one of the many people that they have victimized. And, yes, we rely on publicly available information because that's all that's there. And under Rule 9b, which they never brought a motion under Rule 9b challenging the strength of our allegations, we're entitled to do that, and we would love to get into discovery to figure out more of the particulars relating to this corruption and their efforts to silence critics in the United States and in Latin America. And so this whole argument that Mr. Reich is not some kind of victim of retaliation, of course he was retaliated against because they didn't know what he had to say. And now that they've got the complaint and the relationship was cut off so early, he didn't have time to develop and to investigate and to figure out more information that would have perhaps helped BBC defend their claims. And on this issue that they never got any property, they did get property because shortly after Mr. Reich was fired by BBC, these guys were able to settle with BBC and walk away with a settlement, which they obviously wanted. So they did get property. So that whole argument that they didn't get property is also unavailing. And as far as Mr. Trabeau is concerned, the district court never reached the issue of whether he is subject to jurisdiction under 1965b. So if there is a RICO claim and if we're entitled to those expanded jurisdictional provisions, we would be more than happy to go down and explore that issue with Mr. Trabeau. And also notice that Mr. DiMaria does not disagree with the district's court conclusion that aside from Mr. Bettencourt's residence, all facts relating to Mr. Trabeau are the same. As far as transacting business, they both own Derwick, so all their banking relationships, all their law firm relationships, everything is the same. He doesn't contest that. He's relying on procedural technicalities, which I made a strategic decision not to waste another 12 pages going over the same facts for both defendants. Thank you all. You're welcome.